IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TERRANCE PRUDE,

                            Plaintiff,                           OPINION AND ORDER

    v.

                                                          17-cv-336-slc

ANTHONY MELI and
GARY BOUGHTON,

                            Defendants.

---

    *Pro se* plaintiff Terrance Prude, who was previously incarcerated at Waupun Correctional Institution (Waupun), filed this lawsuit after he was punished at Waupun in 2017 for receiving a payment for an illicit business arrangement, threatening an officer, lying, unauthorized use of the mail, and unauthorized transfer of property.  Prude claims his punishment violated his constitutional rights, and I granted Prude leave to proceed on: (1) Fourteenth Amendment due process claims against defendant Anthony Meli, in his individual capacity, and Gary Boughton, in his official capacity, related to Meli's interference with the disciplinary hearing evidence and process; and (2) a First Amendment claim against Meli for his alleged interference with Prude's correspondence with Attorney Brent Nistler.

    Before the court are five dispositive motions:  Prude filed a motion for judgment on the pleadings (dkt. 56) and two motions for summary judgment (dkts. 57, 107); and defendants filed two motions for summary judgment (dkts. 75, 112).[1]  I am denying Prude's motions because the undisputed evidence of record does not support judgment in his favor on either of his claims, and I am granting defendants' motions because, even when construing the evidence

---

[1]  After granting Prude leave to proceed on an additional theory related to his Fourteenth Amendment due process claim against Meli, I allowed the parties to file second motions for summary judgment. (Dkt. 103, at 3.)

of record in the light most favorable to Prude, no reasonable trier of fact could find in Prude's favor on either of his claims.

## UNDISPUTED FACTS[2]

Plaintiff Terrance Prude was incarcerated at Waupun in November of 2016, when the events comprising his claims occurred.  Defendant Meli was working as Waupun's security director.[3]  Among Meli's responsibilities was overseeing all of Waupun's security activities, which includes Waupun's mail and property.

### A.  Meli's Decision to Monitor Prude's Communications

Meli explains that Prude has been identified as a member of the Gangster Disciples, a violent criminal enterprise that has a significant presence in Wisconsin's prisons, including Waupun.  The Wisconsin Department of Corrections (DOC) recognizes the Gangster Disciples as a security threat group.  Prude disavows membership in the Gangster Disciples.  Prude attests that he practices a religion called Growth and Development, which prison officials incorrectly associate with the Gangster Disciples.  Regardless, it is undisputed that because of his perceived association with the Gangster Disciples, Prude's non-legal communications have been monitored since at least 2015.

---

[2]  I have drawn the following material facts from the parties proposed findings of facts and responses, along with the cited evidence of record.

[3]  Defendant Boughton has been included in this lawsuit in his capacity as WSPF's warden because Prude is seeking injunctive relief in the form of the return of the confiscated money, and he was incarcerated at WSPF when he filed this lawsuit.  If any of Prude's claims had survived summary judgment, then I would substitute a defendant with the authority to carry out any injunctive relief the court might order, but because I'm granting defendants' motion for summary judgment, I need not take that step.

At some point in 2016, Prude's communications suggested to Meli that Prude was expecting to receive a large amount of money from Attorney Brent Nistler.  Prude's communications also indicated that Prude was expecting to receive a copy of a publication titled *From Gangster Disciple to the Blueprint Growth & Development* (the Blueprint) through Nistler.[4]  The Blueprint is known to be disseminated among Gangster Disciples in and out of prison.

Meli avers that Prude's communications led him to believe (1) Prude was in an improper business relationship with Nistler and another inmate, Joeval Jones, in which Nistler agreed to split legal fees with Prude in exchange for referrals, and (2) Prude was expecting to receive the Blueprint from Nistler.  Because Meli felt it appropriate to investigate exactly what was going on between Prude and Nistler, Meli consulted with the Office of Legal Counsel and began monitoring Prude's correspondence with Nistler in November 2016.  Additionally, Meli broadened the scope of Prude's mail monitoring to screen for contraband and non-legal mail that might be disguised as legal mail.  Meli claims that he did not *read* any of Prude's actual legal mail.

Prude disputes Meli's characterization of his communications.  Prude claims that he never charges prisoners for helping them with legal matters, and that his communications with Nistler were about a business deal wholly unrelated to Prude assisting other prisoners.  With respect to Jones in particular, Prude admits that he was expecting to receive a percentage of Jones's award from a lawsuit, but he maintains that his receipt of this money was innocent.  Prude says that Jones is a longtime friend whom he agreed to help with a lawsuit, but eventually

---

[4] Meli believes Prude was working with Nistler because an unknown third party submitted the Blueprint to the court for filing in this case on behalf of Prude, and the return address from that submission was from zip code 53204 in Milwaukee, where Nistler is located.

he referred Jones to Nistler because Nistler could better assist him at trial.  (*See* Compl. (dkt. 1) ¶¶ 19-22.)  Jones's lawsuit was successful, and he received a payment of $40,000.

According to Prude, Jones decided to surprise Prude by retaining Nistler to represent Prude in a post-conviction motion to challenge Prude's conviction, telling Prude's friends and family his plan.  (*Id.* ¶¶ 23, 24.)  Prude explains that when he heard about this and asked Jones about it, Jones revealed his plan to retain Nistler for him.  (*Id.* ¶¶ 25-26.)  Prude eventually also learned Jones intended to devote 25% of the funds he won to Nistler's representation of Prude.  (*Id.* ¶ 32.)  However, Prude claims he wanted another attorney, possibly Robert Meyeroff, to represent him.[5]  Because Prude was unsure whom he would hire, Prude asked Nistler to forward the $10,000 to him at Waupun.  (*Id.*)

Prude also claims that Meli was reading his legal mail, not just screening it.  According to Prude, in a November 8, 2016, letter to Nistler, Prude wrote about a lawsuit he and Nistler were considering related to the tenants of Growth and Development.

### B.  Prude's Receipt of $10,000 and Conduct Report 2936062

On December 8, 2016, a check from Nistler Law Office to Prude for $10,000 was intercepted and held in Waupun's business office.  Prude learned that the money had been withheld on December 15, so he reached out to Meli in a letter, and Meli responded that the money would be held pending an investigation into the source of the funds.  Prude claims that on December 22, 2016, he had an interview with Meli, during which Meli allegedly told Prude that no matter what happened, his $10,000 would not be returned to him, and that the hearing

---

[5]  There appears to be more to this story:  the evidence of record included a letter from Nistler to Prude explicitly declining to represent Prude.  (*See* Ex. 1000 (dkt. 80-1) 25.)

officer[6] "knows the funds are not to be released to you or your lawyer."  (Prude Decl. (dkt. 109) ¶ 2.)[7]

On January 25, 20217, Meli issued Prude Conduct Report 2936062, charging him with violating Wis. Admin. Code §§ DOC 303.40 "Unauthorized Transfer of Property," 303.31 "Lying," 303.18(1) "Threats," 303.36(3)(a) "Enterprises and Fraud," and 303.49(6) "Unauthorized Use of the Mail."  Also, Nistler was reported to the Wisconsin Office of Lawyer Regulation.

### C.  Prude's Disciplinary Hearing

Prior to the disciplinary hearing related to those charges, Prude collected evidence in his defense.  He asked to pose questions to Jones and Nistler, and he was allowed to do that through his advocate at Waupun.  Jones and Nistler submitted responsive letters on Prude's behalf.  Prude was not allowed to review those letters before the hearing, but it is undisputed

---

[6]  Prude submitted two different declarations that describe this interview.  In this first, Prude says that Meli told him that the "hearing officer" would not release the funds (Prude Decl. (dkt. 109) ¶ 2), and in the second, Prude says Meli specifically said that Westra would not release the funds (Prude Decl. (dkt. 121) ¶ 2).  Meli had not yet issued the conduct report as of the December 22, 2016, interview.  Because no evidence of record indicates that Westra knew about the investigation, or had been assigned as the hearing officer for the eventual charges, I find Prude's statement in his first declaration to be accurate.

[7]  Prude also submits as evidence an Information Request he claims he submitted to Waupun's business office.  (Prude Decl. Ex. 1 (dkt. 121-1).)  In that request, Prude asked whether Meli specifically ordered that the $10,000 be placed in the state general fund, and he received an affirmative response from Waupun employee Kamphius.  Kamphius is not a defendant to this lawsuit, so her response does not fall into the statement by a party opponent hearsay exclusion.  *See* Fed. R. Evid. 801(d)(2).  Prude claims that Kamphius's statement can be attributed to Meli because she made the statement as Meli's "servant," alluding to exclusion from hearsay statements "made by the party's agent or employee on a matter within the scope of that relationship," *see* Fed. R. Evid. 801(d)(2)(D).  However, Meli was not Kamphius's employer; rather they were both DOC employees.  Further, a declarant's later report to a third party of a statement that the declarant's supervisor directed to the declarant does not fit within the agency exception to the hearsay rule.  Accordingly, I have not considered this exhibit in resolving the parties' motions.

that Jones and Nistler denied that Prude was receiving the money for providing legal services. Prude also attempted to obtain a letter that Meyeroff had written to Prude in October of 2016, in which Meyeroff raised several questions about Prude's desire to pursue a post-conviction motion. (*See* dkt. 1-1, at 11.)

As to the Meyeroff letter, Prude claims that Meli prevented him from presenting this letter for use at his disciplinary hearing. Prude claims that he wrote to Meli, asking for the copy of the Meyeroff letter that Prude claimed he turned over to Meli, but Meli responded in writing "No -- you can't present your evidence at the hearing. Consistent with policy." (Compl. (dkt. 1) ¶ 51.) Meli does not deny writing this, but he claims that Prude never gave him a letter from Robert Meyeroff before the disciplinary hearing. Meli further attests that he never withheld that letter, and he would not have the authority to withhold such a letter.

On January 25, 2017, about a week before the disciplinary hearing, a Waupun official offered Prude an uncontested major disposition for the charges in the conduct report, as authorized by Wis. Admin. Code. § DOC 303.78. An uncontested disposition is essentially a plea agreement: the inmate agrees to the charges in the conduct report, accepts the offered punishment, and bypasses the need for a disciplinary hearing. In Prude's circumstances, he was offered 180 days of disciplinary separation and the seizure of the $10,000.

The parties dispute who approached Prude with the offer. Prude claims that Meli made Prude the offer. (Prude Decl. (dkt. 109) ¶ 3.) Prude also points to an email that defendants produced during discovery, in which Meli communicated with Waupun's Security Threat Group Coordinator Bret Mierzejewski about the uncontested disposition offer, writing "Offered him 180 DS and seize $10,000 to the state general fund." (Dkt. 98-1.)

Meli denies making the offer to Prude and says he cannot remember who made the

6

offer, but he believed it was a supervising officer.  In his declaration, Meli clarifies the context of that email, explaining that he was reporting to Mierzejewski that an offer had been made. (Meli Supp. Decl. (dkt. 116) ¶¶ 4-5.)  While the email Meli sent discussing the uncontested disposition does not conclusively establish that Meli made the offer, Prude's averment that Meli made the offer creates a genuine dispute of fact about who made the offer.  Regardless, Prude rejected it, so the conduct report proceeded to a due process hearing as a contested major conduct report, pursuant to Wis. Admin. Code § DOC 303.80.

The disciplinary hearing took place on February 2, 2017.  Captain Westra served as the hearing officer.  Westra had not been involved in the investigation leading up to the charges in the conduct report, and he never received the email Meli wrote to Mierzejewski about the January 25 uncontested disposition offer.  However, Westra attests that he would have been informed about the offer.

During the hearing, Meli was present because Prude has requested his attendance as a witness; according to Prude, Meli sat at the front near Westra.  Westra asked Meli if he wanted to read the conduct report, and Meli told Westra he could read it.  According to Prude, before reading the conduct report, Westra told Prude his "hands were tied" with respect to both the 180 day-disciplinary separation sentence and the seizure of the funds, and that Meli smiled when he said this.  (Prude Decl. (dkt. 109) ¶ 7.)  Westra disputes making this statement.

Prude made a statement in his own defense, arguing that the $10,000 was to hire an attorney and he never lied about the source of the money.  (Ex. 1000 (dkt. 80-1) 29.)  It appears that Prude acknowledged that he was guilty of threats and unauthorized use of mail, but he insisted that he did not lie to Meli, characterizing it as a miscommunication related to the use of the money.  (*Id.* at 33.)  Prude admitted that he proposed a business venture to

Nistler in which Nistler would give him money for future cases he would win, but he thought it was legal.  Prude also requested to see the witness statements from Jones and Nistler, and according to Prude, Westra said that there were none, which was strange to Prude because he had been told that the letters were handed to Westra.  Apparently Meli left the room during the hearing.  Prude claims that after Meli left, Westra commented "[Y]ou must've pissed Meli off.  You already know what the sentence is which is the same sentence Meli offered you.  You can appeal to the Warden as I'm sure you will."  (Prude Decl. (dkt. 109) ¶ 9.)

Following the disciplinary hearing, Westra found Prude guilty of Lying, Threats, Enterprises, and Fraud, but found him not guilty of Unauthorized Transfer of Property.  Westra noted that he considered (1) the statements in the conduct report, (2) testimony from Meli, and (3) nine letters.  Westra listed the following witnesses:  Prude, Meli, Nistler, and Jones, describing Nistler's and Jones's testimony as "Questions and answers submitted as evidence."  (*Id.* at 30-1.)  Here are the material portions of Westra's reasoning in support:

> Based on the report, 9 letters secured during the investigation and the report writer's testimony, the inmate received $10,000 from the law office of Brent Nistler.  Also, in those letters inmate Prude was attempting to enter into a business deal with Mr. Nistler, which he admits to[.]  Inmate Prude would receive a percentage of money for all cases he referred to the law office[.]  Note inmate Prude states that the $10,000 he received was his money that inmate Jones paid to Mr. Nistler as a retainer for his defense.  Inmate Prude then states that he no longer wanted Mr. Nistler as his attorney and the check was sent to him.  Inmate Prude stated that he was going to retain another[.]  In fact the letters show that inmate Prude was sending money to his family and friends.  In one letter inmate Prude writes to Mr. Nistler that he is to keep $500 and that money should be sent to the Menard Correctional Facility for his Uncle Vincent Galloway.  In other letters inmate Prude writes that he will send more money when he wins the next case in 6 or 7 months.  When inmate Prude was interviewed by Security Director Meli, inmate Prude states that "you don't know who you are messing with or how high up this goes -- hey Meli people know where you live -- your address is out there."  At one point inmate Prude states that he was involved in [a] case that he and inmate Jones won.  In fact it was Jones who won the case.

8

> While inmate Prude was on a mail monitor he was found to be circumventing the mail process by including multiple letters for other than the receiving recipient. After reviewing all information, the Hearing Officer finds inmate Prude guilty of lying, threats (1), enterprises and fraud (3)(a) and unauthorized use of the mail.

(Ex. 1000 (dkt. 80-1) 30.)

Having found Prude guilty of four of the charges, Westra turned to the appropriate punishment based on the relevant policies. Hearing officers have some discretion about what disposition to give a prisoner who has been found guilty of violating rules, but the amount of time cannot exceed the duration set forth in the Schedule of Penalties, *see* Wis. Admin. Code § 303.72. Additionally, all contraband funds must be deposited into the state general fund pursuant to Wis. Admin. Code § DOC 303.09(2). Relevant here, prisoners may not be punished in excess of 360 days in disciplinary separation, regardless of the charges. That was the maximum that Prude faced here.

Westra declined to impose the maximum amount of disciplinary separation time, observing that Prude had demonstrated fairly good conduct during the previous year, and Prude had accepted responsibility for the enterprise and fraud and unauthorized use of mail charges. Westra sentenced Prude to 180 days in disciplinary separation. Westra also ordered that the $10,000 Prude received be seized and deposited in the state general fund as required by policy. Westra claims that he issued the disposition in compliance with Wis. Admin. Code § DOC 303.72, and that, pursuant to Wis. Admin. Code § DOC 303.09(2), he lacked discretion to direct the $10,000 anywhere other than the state general fund. Westra further attests that he made these determinations the same day as the hearing. Westra specifically denies that the disposition he imposed was influenced by the uncontested disposition offer or Meli, and that Meli did not direct him to impose a certain punishment. Meli avers that he did

9

not order -- and had no authority to order -- Westra to give Prude any particular disposition.

Prude claims that Westra erred in failing to describe why the $10,000 constituted contraband.  Prude also insists that Westra did not act independently, pointing to Prude's assertion that Meli said during their December 22, 2016, interview that Meli could "guarantee that the hearing officer w[ouldn't] return the funds" to Prude or his lawyer.  (Prude Decl. (dkt. 110) ¶ 2.)  Prude alleges that in the days following the hearing, Westra told him that he did not review letters from Nistler or Jones at the time he found Prude guilty of some of the charges, telling Prude that the witness testimony had been received and Prude could appeal the disposition to the warden.  Westra alleges that he *did* consider the statements from Jones and Nistler before making his final decision.  Westra attests that he considered those answers when reaching his conclusions, but the letters did not overcome the "overwhelming evidence" of Prude's guilt on the charges of Lying, Threats, Enterprise, and Fraud.  (Westra Decl. (dkt. 90) ¶¶ 4-5; Ex. 1001 (dkt. 80-1) 35.)

In addition to disputing Prude's account of what Westra told him, defendants object to Prude's report of Westra's statements as hearsay.  Defendants point out that Westra is not a defendant in this lawsuit, so his statements do not fall under statement by a party opponent exclusions under Federal Rule of Evidence 801(d)(2).  Prude responds that Westra's statements are excluded from the bar on hearsay because Westra made those statements as Meli's "agent or employee" on a matter within the scope of employment, *see* Fed. R. Evid. 801(d)(2)(D).  Prude's argument fails on this record.  Under Rule 801(d)(2), the statement to be admitted "does not by itself establish the declarant's authority" to make a statement on a party-opponent's behalf.  Westra's alleged statements to Prude do not establish that he was acting in his capacity as Meli's agent.  Although I allowed Prude to proceed against Meli on a theory

that Meli controlled Westra's decision-making, Prude has not come forward with any evidence (beyond his own conclusory assertions) about Meli's ability to control Westra's decisions in a disciplinary hearing.  Furthermore, under Wis. Admin. Code. § 303.79, the warden, not the security director, assigned the hearing officer to conduct the disciplinary hearing.  As such, I cannot conclude as a matter of law that Westra's statements related to the conduct report hearing were made in his capacity as an agent of Meli.  Therefore, I am sustaining defendants' objection to Prude's statements about what Westra told him.

### D. Prude's Inmate Complaints

Defendants' position is that Prude never filed an inmate complaint about Meli's review of his legal correspondence with Nistler.  Prude has filed inmate complaints about mail interference.  In 2013, he filed one inmate complaint complaining about interference with his legal mail, WCI-2013-2288.  And in 2017, Prude filed two inmate complaints related to his mail, WCI-2017-6031 and WCI-2017-21930, in which he lodged general complaints about delays in outgoing mail.

Prude claims that he filed three different inmate complaints about Meli's mail interference related to this lawsuit:  WCI-2017-3061, WSPF-2017-6826, and WSPF-2017-7944. WCI-2017-3061 and WSPF-2017-6826 are noted in Prude's Inmate Complaint History chart as "Challenges CR#2936062" but Prude has not provided any evidence as to exactly what he alleged in those complaints and whether he took all of the necessary steps to exhaust the claims raised in those two conduct reports.  Prude has provided a copy of WSPF-2017-7944, in which he was appealing the warden's affirmance of his conduct report.  On the bottom of the last page of that inmate complaint, Prude complained that his legal mail had been

opened, which "chilled" any correspondence he would have with other lawyers.  (Dkt. 84-2, at 10.)

OPINION

## I.    Prude's Motion for Judgment on the Pleadings

A motion for judgment on the pleadings under Rule 12(c) is reviewed under the same standard as Rule 12(b)(6), except that the court considers not only the complaint and referenced documents, but all pleadings, as well as documents that are incorporated into any pleading by reference.  *Buchanan-Moore v. City of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009); *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991).  To succeed, "the moving party must demonstrate that there are no material issues of fact to be resolved," despite the court viewing all facts in the light most favorable to the nonmoving party.  *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998).  While the non-moving party's factual allegations are, therefore, generally accepted as true in response to a 12(c) motion, "allegations in the form of legal conclusions are insufficient to survive." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (citing *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012)).

Prude seeks judgment on the pleadings with respect to his claims that Meli withheld exculpatory evidence (the Meyeroff letter), that he had a property interest in his $10,000, and that his mail was unlawfully opened.  I am denying Prude's motion.  Defendants denied Prude's allegations in their answer, disputing Prude's recitation of the material facts and conclusions of law.  As such, there is no basis upon which to conclude that Prude is entitled to judgment on any of his claims in his favor.

II.     **Cross Motions for Summary Judgment**

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted).  When the parties cross-move for summary judgment, the court looks to the burden of proof that each party would bear on an issue at trial and requires that party to go beyond the pleadings to affirmatively establish a genuine issue of material fact.  *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).  If either party fails to establish the existence of an element essential to his or her case, and on which that party will bear the burden at trial, then summary judgment against that party is appropriate.  *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

A.      **Fourteenth Amendment due process claim**

Prude contends that he was denied adequate procedural due process both when his $10,000 was confiscated and when he was placed in segregation after his disciplinary hearing, on the theories that (1) Meli inappropriately prevented him from offering Meyeroff's letter in his defense during the disciplinary hearing; and (2) Meli served as a de facto decisionmaker in directing Westra's actions, since Meli predetermined Prude's punishment and directed Westra

13

to impose it.[8]  The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  To prevail on a § 1983 procedural due process claim, a plaintiff must demonstrate that he: (1) has a cognizable interest; (2) has suffered a deprivation of that interest; and (3) was denied due process.  *Kahn v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010).

Defendants concede for summary judgment purposes that Prude suffered a loss of a cognizable interest but seek judgment on this claim against Meli because (1) Prude did not suffer prejudice due to the exclusion of the Meyeroff letter, (2) there is no evidence suggesting that Meli withheld the letter, and (3) the evidence of record does not support a reasonable finding that Prude was denied a neutral decisionmaker during the disciplinary hearing.  Prude maintains that he is entitled to judgment in his favor because Meli cannot reasonably dispute Prude's evidence of Meli's actions, which establishes that Meli inappropriately prevented Prude from defending himself and that Meli intervened in the disciplinary hearing in a manner that deprived Prude of neutral decision-maker.  I will frame this analysis based on defendants' arguments, since they are dispositive.

---

[8]  Prude argues that the court should have also allowed him to proceed on a substantive due process claim because the $10,000 was confiscated even though Westra found him not guilty of the Unauthorized Transfer of Property charge in the conduct report.  *See Leslie v. Doyle*, 125 F.3d 1132, 1136 (7th Cir. 1997) (an abuse of power that "shocks the conscience" supports a substantive due process claim).  However, Prude ignores the fact that he was found guilty of all of the other charges in the conduct report, which were Lying, Threats, Enterprise and Fraud, all arising from the same conduct.  Prude also claims that for a prisoner's property to be deemed "contraband," the adjustment committee must designate it as such, citing to Wis. Admin. Code. § DOC 303.02(8)(f).  Prude does not fully cite subsection (f), which defines contraband as "items deemed contraband by the disciplinary hearing or hearing officer."  Westra's finding of guilt did not explicitly find that the $10,000 was contraband, but his failure to make such an explicit finding could not reasonably be construed as an abuse of authority, rising to the level of a due process violation.  Accordingly, Prude's allegations in this case do not support a substantive due process claim.

### 1. Lack of Prejudice

Prude claims that Meli violated his due process rights in refusing to allow Prude to submit Meyeroff's letter as evidence during the conduct report hearing.  "Prisoners faced with a disciplinary proceeding have a right to disclosure of material exculpatory information if they request it before or during the hearing."  *Keller v. Watson*, 740 F. App'x 97 (Mem), 2018 WL 5046797, at *2 (7th Cir. Oct. 17, 2018) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-69 (1974), and *Piggie v. McBride*, 277 F.3d 922, 925 (7th Cir. 2002) ("*Piggie I*")).  Although prisoners do not have the right to *review* such materials, they do have the right "to insure that the disciplinary board considers all of the evidence relevant to guilt or innocence and to enable the prisoner to present his or her best defense."  *Piggie v. Cotton*, 344 F.3d 674, 678 (7th Cir. 2003) (citing *Chavis v. Rowe*, 643 F.2d 1281 (7th Cir. 1981)).  In circumstances in which a disciplinary board or officer excludes potentially exculpatory evidence, the institution has the burden to provide a legitimate reason for the denial.  *Piggie I*, 277 F.3d at 925 (citing *Ponte v. Real*, 471 U.S. 491, 498-99 (1985)).

To start, there is a genuine factual dispute about whether Meli denied Prude's request to introduce the Meyeroff letter at the hearing.  Defendants concede this but argue that the dispute is immaterial because withholding the Meyeroff letter could not constitute a due process violation because "harmless error analysis applies to prison disciplinary proceedings."  *Piggie*, 344 F.3d at 678 (citing *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)); *see also Martin v. Zatecky*, 749 F. App'x 463, 466 (7th Cir. 2019) (prisoner "does not have a right to call witnesses who would give irrelevant, repetitive, or unnecessary testimony").  Although the Seventh Circuit decided *Piggie* in the context of a habeas petition, it has extended this principle in the context of due process claims in lawsuits brought under 42 U.S.C. § 1983.  *See Oliver v.*

15

*Pfister*, 655 F. App'x 497, (7th Cir. 2016) (affirming dismissal of due process claim in which plaintiff's request for the appearance of the reporting officer was denied because plaintiff did not dispute the officer's allegations in the conduct report, meaning that the officer's testimony would not have aided in his defense); *Jackson v. Everett*, No. 06-2809, 2007 WL 1224609, at *2 (7th Cir. Apr. 24, 2007) (unpublished) (policy prohibiting inmate from calling witnesses did not amount to a due process violation because plaintiff had not articulated how he was prevented from admitting relevant evidence).

Here, Prude did not want Meyeroff to testify, he just wanted to admit the October 2016 letter from Meyeroff related to his potential representation of Prude in a post-conviction motion. Prude has not explained how Meyeroff's letter could have helped Prude rebut the charges that he had received the money illicitly. This is a problem for him, especially given that Prude conceded that he was trying to enter into a business agreement with Nistler that would entitle him to referral fees. Prude simply argues that the Meyeroff letter would have buttressed his statement during the hearing that he was going to hire another attorney. To be fair, Westra's reasoning did focus a fair amount on debunking Prude's statement that he intended to use the money to hire an attorney; Westra noted that Prude's communications showed that he was sending money to friends and family. Still, Westra *also* found that Prude's communications with Nistler showed an intent to enter into a business deal, *and* that Prude threatened Meli when Meli interviewed him about the charges, *and* that Prude made false statements about Jones' lawsuit, *and* that Prude had circumvented mail policies. (*See* Ex. 1000 (dkt. 80-1) 30.) Prude does not explain how that letter could have somehow rebutted the charges that Prude had received $10,000 through an illicit agreement with Nistler, had lied about it, threatened Meli, and had used the mail inappropriately. As a result, there is no basis

16

to conclude that the Meyeroff letter would have assisted in Prude's defense.  Accordingly, I am denying Prude's motion for judgment in his favor on this claim, and granting defendants' motion as to this claim.

### 2.  Meli's Personal Involvement

Also with respect to the Meyeroff letter, defendants argue that the evidence of record does not support a finding that Meli was responsible for withholding a letter from Robert Meyeroff.  Defendants' position is weaker here, since it is premised on the court accepting as true Meli's assertion that he did not discuss the letter with Prude.  To do so would require me to credit Meli over Prude, who says that Meli told him he could not use the letter during the hearing.  Given that I can't make credibility findings at the summary judgment phase, defendants' personal involvement argument fails.

### 3.  Meli as Biased Decision-Maker

Finally, defendants seek judgment in their favor on Prude's claim that he was denied a neutral decisionmaker during his conduct report hearing because Meli improperly directed Westra to reach the sentence that was imposed.  Generally, a prisoner facing transfer to and confinement in segregation is "entitled to informal, nonadversarial due process."  *Westefer v. Neal*, 682 F.3d 679, 684 (7th Cir. 2012) (citing *Wilkinson*, 545 U.S. at 211-12).  "Informal due process requires only that the inmate be given an opportunity to present his views" to a neutral decisionmaker.  *Id*. at 685 (internal quotation marks omitted).  Conduct report hearing officers are entitled to a presumption of neutrality, so the constitutional standard for impermissible bias is high.  *Id.* (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986); *Martin*, 749 F.

at 466 ("We presume the honesty and integrity of adjudicators, and the burden for proving impermissible behavior is high.").

Still, due process forbids an officer substantially involved in the events or investigation of disciplinary charges from adjudicating those same charges. *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) (citing *Whitford v. Boglino*, 63 F.3d 527, 534 (7th Cir. 1995)).  When I allowed Prude to proceed against Meli on Prude's claim that Meli directed Westra's findings and predetermined the punishment he would impose, I determined that Prude's allegations supported a reasonable inference that Meli had inappropriately controlled the outcome of Prude's disciplinary hearing.  (8/9/2019 Order (dkt. 103).)  But that was at the screening stage. To survive summary judgment (and certainly to succeed on his own motions), Prude had to come forward with evidence showing that Meli controlled Westra's decision-making process in order to rebut the presumption that Westra was neutral.  Prude cannot now rely on speculation. *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999) (summary judgment is the "put up or shut up" moment in a lawsuit "when a party must show what evidence [he] has that would convince a trier of fact to accept [his] version of events").  Although Prude insists that the evidence of record supports his claim that Meli's influence over Westra, even considering all of the evidence in the light most favorable to Prude would require the trier of fact to assume that certain events occurred that simply are not in evidence.

As an initial matter, Prude contends that because Meli offered him the uncontested disposition, Meli served as a de facto hearing officer, characterizing Meli's offer of an uncontested disposition as an informal disciplinary hearing.  In support, Prude cites to the Wis. Admin. Code § DOC 303.78, which sets forth the procedure governing uncontested disposition offers.  However, even assuming Meli is the person who made the offer, that policy did not

18

prohibit Meli from making it.  Under § DOC 303.78, after an officer writes a conduct report, a supervising officer may inform the prisoner of the alleged infraction and contemplated disposition, and, if the prisoner agrees to the proposed disposition, then the security director may approve the disposition, recommend a different disposition, or review the charges for a referral as a major or minor infraction.  (Ex. 1002 (dkt. 115-1) 15.)  The policy does not prohibit the reporting officer or the security director from making an uncontested disposition offer.

More importantly, Prude has not cited any authority explaining how an officer who writes the conduct report violates a prisoner's due process rights by offering that prisoner an uncontested disposition.  This absence of support makes sense.  The "neutral decisionmaker" requirement is grounded in prisoners' due process right to mount a defense during a hearing, and to have an unbiased officer resolve factual disputes to reach a guilty or not guilty finding. An officer who makes an uncontested disposition offer doesn't adjudicate the charges; he or she is acting more like a prosecutor who offers a plea deal.  In any event, Prude *rejected* the offer and exercised his right to a hearing.  The mere fact that an offer was made – regardless who made it – does not implicate Prude's due process rights.

Next let's consider Prude's arguments related to the February 2 disciplinary hearing. I'll start with Prude's evidence that he claims shows that Meli controlled the outcome of the hearing.  Prude first cites to Meli's email to Mierzejewski, which Prude says shows that Meli was the one who offered him the uncontested disposition and predetermined his punishment. Prude also points to Meli's statement to him that "no matter what," the $10,000 would not be returned, and the Information Request that confirmed that Meli directed the $10,000 to the state general fund.  Of course, Meli denies offering Prude the uncontested disposition and

making that statement, and I've concluded that the Information Request answered by Kamphius is inadmissible evidence. But let's put all of this evidence into the analysis. It does not advance Prude's claim, because it does not support a reasonable inference that Meli inappropriately influenced how *Westra* would resolve the charges in the conduct report. As to Meli's email about the uncontested disposition offer, Prude claims that the fact that Westra ultimately imposed the same punishment shows that Meli improperly influenced Westra. Yet it is undisputed: that Westra never received that email; that Meli did not direct him to impose that punishment; and that Westra, as the hearing officer, would have learned about the uncontested disposition offer. Although the record does not reveal precisely *how* Westra learned about the offer, it is speculation to conclude that Meli must have been the person who told him about it, or that Meli directed Westra to impose that same punishment. The most reasonable inference to draw from Westra's decision to impose the same punishment as was offered in the uncontested disposition is that Westra found it to be an appropriate punishment and that Westra felt bound by policy to direct the money into the state general fund. Indeed, Westra averred as much.

Returning to the plea bargain analogy, a pre-hearing disposition offer needs to be better than the predicted outcome of the hearing, else the prisoner had no incentive to accept it. If Westra had imposed a sentence harsher than the offer – and he could have – this would be stronger proof of institutional collusion because it would allow the inference that Westra had punished Prude for rejecting the offer. The fact that Prude got the same sentence at the hearing that he was offered before it does not support his claim of a due process violation. The most logical inference to draw is that two different officers concluded, independently, that this was an appropriate outcome.

20

As for Meli's statement to Prude during the December 2016 interview, Meli may have been wise to decline to comment about what would happen to the $10,000, but context matters.  In December, Meli was still investigating Prude's actions, and Prude had reached out to Meli specifically about what was going on which the $10,000.  Assuming Meli made that statement, he may have done so thinking it would have elicited a confession from Prude. Regardless of his intention, when considering Meli's statements as responsive to Prude's direct inquiries, Meli's assertion suggest that he was confident in the charges he lodged against Prude, not that he was orchestrating the outcome of the disciplinary hearing that took place almost two months later.

Prude also points to what he alleges happened during the hearing:  first is Meli's presence and placement next to Westra.  Next are Westra's alleged statements to Prude during the hearing, about his hands being tied and that Prude must have pissed off Meli, and that Westra was imposing the punishment that Meli had offered Prude.  Meli's presence at the hearing is not suspicious:  Prude called him as a witness, which was why Meli was there.  Prude claims that the "optics" of Meli sitting close to Westra make it reasonably clear that Meli was the decision-maker along with Westra.  However, Prude has not alleged that Meli conducted any portion of the hearing along with, or instead of, Westra, or that Meli interjected himself into the proceedings in any manner that would suggest that Meli was controlling the hearing.

As for Westra's statements, I've concluded they are inadmissible hearsay, since Westra is not a party to this lawsuit and he was not Meli's agent.  But even if I were to accept Westra's statements into evidence, they do suggest that Meli directed the final disposition.  As mentioned, Westra attests that (1) he would have been informed about the uncontested disposition offer, (2) he imposed the 180-day sentence and seized the money pursuant to policy

21

and Prude's good behavior and admissions of guilt, and (3) he was bound by policy to direct the $10,000 to the state general fund.  As noted above, Westra's explanation is consistent with him having exercised independent judgment.  Therefore, even accepting and considering that Westra made this statement to Prude, in the absence of *any* evidence of communication between Meli and Westra related to how Westra should resolve the charges, the only reasonable inference to be drawn is that Westra felt his "hands were tied" because he had reviewed the charges and knew he would have to confiscate the funds, not that Meli told him to find Prude guilty and to impose a specific punishment.

Prude also points to Westra's alleged statement during the hearing that he did not have the letters from Nistler and Jones, apparently to buttress Prude's claim that Westra's conclusions were perfunctory.  Again, Prude's averments about what Westra said are hearsay.  Regardless, Westra specifically referenced the statements by Jones and Nistler in resolving the conduct report, and Westra also avers that he was not persuaded that the Jones and Nistler letters rebutted the clear evidence that Prude was guilty of lying, threats, enterprise, and fraud.  Construing this evidence in Prude's favor, I accept that Westra told Prude he did not have the statements.  However, that does not necessarily mean that Westra did not have access to the statements, and Prude has not submitted any other evidence suggesting that Westra did not have those letters.  In any event, Westra has averred that the statements from Jones and Nistler failed to rebut the overwhelming evidence of Prude's guilt to the charges of enterprise and fraud, lying, threats, and unauthorized use of the mail.  And again, even assuming Westra did not have the letters *during* the hearing but incorporated them into his disposition later that day, there still is no evidence suggesting that Meli somehow prevented Westra from reviewing those letters.

22

Prude's version of what occurred, which I am accepting for summary judgment purposes, allows the inference that Meli had an outcome in mind that he was trying to ensure. But the fact remains that Westra was the actual decision maker. The standard for proving Westra's impermissible bias is high, and Prude has not come forward with any evidence suggesting that Meli actually manipulated Westra's handling of the disciplinary hearing. Rather, even construing Prude's version of the facts in the light most favorable to him, his evidence that he was denied a neutral decision maker requires speculation about what *may* have happened between Meli and Westra. This is insufficient to create a genuine dispute as to whether Westra was neutral. *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012) (speculation or conjecture insufficient to raise issue of material fact). As such, no reasonable trier of fact could find in Prude's favor on either of his theories supporting his due process claim. Accordingly, I am denying Prude's motion for summary judgment on this claim, and I am granting defendants' motions.

## B. First Amendment mail interference claim

Prude claims that he is entitled to judgment as a matter of law on his mail interference claims. Defendants argue the opposite on two grounds: (1) Prude failed to exhaust his administrative remedies with respect to this claim;[9] and (2) Prude's claim fails on the merits.

---

[9] Prude objected to defendants' exhaustion defense on the ground that they did not raise it by the April 19, 2019, deadline set forth in the Preliminary Pretrial Conference Order. (*See* dkt. 62.) However, this case progressed uniquely; Prude filed early dispositive motions and defendants worked diligently to respond to the merits of his claims, raising the exhaustion affirmative defense that the same time they responded to Prude's dispositive motions. Given that Prude does not identify any prejudice he suffered as a result of defendant's failure to meet the April 19 deadline, I will not bar defendants from pursuing it for that reason. The early deadline for exhaustion motions is intended by this court as a front-end housekeeping measure. This court does not routinely deny exhaustion motions just because they are filed late.

I will address defendants' arguments in turn.

### 1. Exhaustion of Administrative Remedies

Under 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   Generally, a prisoner also must "properly take each step within the administrative process" to comply with § 1997e(a).  *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).  This includes following instructions for filing the initial grievance, *Cannon v. Washington*, 418 F.3d 714, 718 (7th Cir. 2005), and filing all necessary appeals, *Burrell v. Powers*, 431 F.3d 282, 284-85 (7th Cir. 2005), that are "in the place . . . at the time, [as] the [institution's] administrative rules require."  *Pozo*, 286 F.3d at 1025.

The purpose of this exhaustion requirement is to give the prison administrators a fair opportunity to resolve the grievance without litigation.  *Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006); *see Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) ("once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement").  If a prisoner fails to exhaust administrative remedies before filing his lawsuit, then the court must dismiss the case.  *Perez v. Wisconsin Dept. of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999).   Because exhaustion is an affirmative defense, however, *defendants* bear the burden of establishing that plaintiff failed to exhaust.  *Jones v. Bock*, 549 U.S. 199, 216 (2007).

Under the regulations applicable in 2016 and 2017, prisoners were required to start the complaint process by filing an inmate complaint with the institution complaint examiner

("ICE") within 14 days after the occurrence giving rise to the complaint.  Wis. Admin. Code § DOC 310.09(6).  After filing the complaint, prisoners were to receive acknowledgment of receipt within five working days.  *Id.* § 310.11(2). The complaint could "[c]ontain only one issue per complaint, and shall clearly identify the issue."  *Id.* § 310.09(e).  If the ICE rejected a grievance for procedural reasons without addressing the merits, then an inmate could appeal the rejection.  *Id.* § 310.11(6).  If the complaint was not rejected, then the institution examiner was to make a recommendation to the reviewing authority as to how the complaint should be resolved.  *Id.* § 310.11(6).  The offender complaint was then to be decided by the appropriate reviewing authority, whose decision could be appealed by the inmate to a correctional complaint examiner ("corrections examiner").  *Id.* §§ 310.12, 310.13.

Prisoners were required to appeal a reviewing authority's decision within "10 calendar days." Wis. Admin. Code § DOC 310.13(1).   The corrections examiner then made a recommendation to the Secretary of the Department of Corrections, who took final action.  *Id.* §§ 310.13, 310.14.  "Upon good cause, the CCE may accept for review an appeal filed later than 10 days after receipt of the decision."  *Id.* § 310.13(2).

Defendants rightly argue that Prude never filed an inmate complaint challenging Meli's review of his legal mail.  The only inmate complaint Prude filed related to the interference with his legal mail at Waupun was in 2013, years before Meli started monitoring his mail.  Further, although Prude has filed two inmate complaints about *delays* associated with his outgoing mail, those complaints did not raise concerns about interference with his legal mail specifically.

Prude's reference to WCI-2017-3016, WSPF-2017-6826, and WSPF-2017-7944 is unhelpful to him.  The one issue Prude raised in each of these inmate complaints was a challenge to the outcome of Conduct Report 2936062.  Even though he included a passing

25

reference to the monitoring of his mail in WSPF-2017-7944, Prude was not seeking to challenge Meli's interference with his mail. Instead, he was challenging the conduct report proceedings. Therefore, I agree that Prude failed to exhaust his administrative remedies with respect to his legal mail interference claim. Accordingly, defendants are entitled to judgment in their favor on their exhaustion defense. Normally Prude's mail interference claim would be dismissed without prejudice, but because defendants are also entitled to judgment on the merits, the judgment will be with prejudice, for the reasons that follow:

### 2. Merits

Based on Prude's allegation that Meli was monitoring his communications with Nistler, I granted Prude leave to proceed against Meli on a First Amendment claim, citing to *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999), and *Wolff v. McDonnell*, 418 U.S. 539, 576-77 (1974). In particular, I noted that mail interference claims dealing with legal communications involve more robust constitutional protections, since such claims may involve a prisoner's ability to access the courts. (11/19/2018 Order (dkt. 41) at 11-12.) Defendants point out that claims involving legal mail interference are analyzed in this circuit under the Fourteenth Amendment's due process clause. *Guajardo-Palma v. Martinson*, 622 F.3d 801, 804 (7th Cir. 2010). In particular, a prisoner pursuing a due process claim about interference with legal mail must show that a non-frivolous legal claim was hindered as a result of the interference. *Id.* at 805-06.

Prude does not respond to defendants' argument framing his claim under the Fourteenth Amendment's due process clause. Instead, Prude claims that the analysis is a straightforward First Amendment free speech claim based on a violation of the attorney-client.

26

This claim is not available to Prude as he frames it.  To start, Prude does not cite relevant authority, relying instead on *Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000), which involved a First Amendment claim brought by a schoolteacher who alleged that he was forced to waive his attorney-client privilege.  The Seventh Circuit held that the defendant in *Denius* was entitled to qualified immunity.  *Id.* at 955.

Prude also cites to a decision from the Eleventh Circuit, *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008), in which that court concluded prisoners have an independent free speech claim related to attorney communications.  In *Guajardo-Palma*, the Seventh Circuit noted the Eleventh Circuit's approach, but held, based on the Supreme Court's reasoning in *Lewis v. Casey*, 518 U.S. 343 (1996), that constitutional claims related to legal mail monitoring require a "showing of hindrance."  622 F.3d at 805.  As such, at least in this circuit, it does not appear that Prude has a free standing First Amendment claim on the ground that Meli violated Prude's attorney-client relationship.[10]

Reviewing the evidence under the Fourteenth Amendment framework outlined in *Guajardo-Palma*, Prude's claim fails as a matter of law for two reasons.  First, defendants point out that Meli's interference with Prude's legal mail was of no consequence, since Prude has not alleged that he was pursuing a non-frivolous legal claim.  Read generously, Prude believes that

---

[10]  The parties do not address Prude's claim in the context of the right to send and receive non-legal mail.  "Prison regulations or practices affecting a prisoner's receipt of nonlegal mail . . . must be 'reasonably related to legitimate penological interests.'"  *Rowe v. Shake*, 196 F.3d at 782 (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989) (quoting *Turner v. Safely*, 482 U.S. 78, 89 (1987))).  Prude did not present this claim under this framework, nor did the court interpret this claim as a *Turner* challenge.  Even if Prude had pursued this claim, it would fail as a matter of law on the record before the court.  It is undisputed that Meli had legitimate concerns that Prude's communications with Nistler violated prison policy and warranted his review of those communications for contraband and to determine whether the communications were related to legal matters.

Meli's review of his legal mail interfered with (1) his potential post-conviction motion that Meyeroff (or another attorney) could have brought, and (2) his potential federal lawsuit related to his Growth and Development beliefs. However, the evidence of record does not suggest that either lawsuit would have been able to survive a motion to dismiss.

Starting with his purported post-conviction motion, Prude claims he wanted to hire Meyeroff, or another attorney, to collaterally attack his convictions and sentence on a theory of ineffective assistance of counsel. However, as defendants point out, in 2016, Prude had already unsuccessfully pursued all the post-conviction relief available to him to challenge his conviction and sentence. In 2000, Prude was convicted in Wisconsin state court on numerous charges related to six armed robberies. *See State v. Prude*, No. 1999CF5988 (Milwaukee Cty. May 1, 2000), available at https://wcca.wicourts.gov/ (last visited Apr. 7, 2020). Prude sought a sentence modification in 2008, which was denied, as was his appeal to the Wisconsin Court of Appeals. *State v. Prude*, App. No. 2004AP554 (Wis. Ct. App. May 6, 2006), available at https://wscca.wicourts.gov/caseSearch.xsl;jsessionid=EFF1CB0D9C2D42E590DB12D6C C9063FE? (last visited Apr. 27, 2020). In 2012, the Eastern District of Wisconsin denied Prude's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See Prude v. Pollard*, No. 2:11-cv-1005, dkt. 23 (E.D. Wis. 2012).

After losing his federal habeas petition, Prude continued to challenge his conviction in state court. Yet the Wisconsin state courts have rejected such efforts; the Wisconsin Court of Appeals has noted that Prude cannot pursue post-conviction relief further, threatening to sanction him if he filed more time-barred post-conviction motions. *See State v. Prude*, 2014 WI App 16, 352 Wis. 2d 575, 842 N.W.2d 537. As such, even if Prude had intended to pursue post-conviction relief in 2016, the publicly available records show that he has either exhausted

28

or procedurally defaulted any conceivable claim.  Prude has not presented any evidence or argument suggesting that he might have a ground to continue challenging his conviction and sentence in Wisconsin state court.  Therefore, no reasonable trier of fact could conclude that Meli's review of his legal mail posed a barrier to him pursuing a legitimate post-conviction motion, through Nistler, Meyeroff, or any other attorney.

As for Prude's potential federal lawsuit, Prude alleged in his complaint that Nistler had agreed to represent him in pursuing § 1983 and/or Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims.  However, according to Prude, Meli's mail monitoring prevented them from proceeding because Nistler decided not to continue his representation after Meli reported Nistler to the Wisconsin Office of Lawyer Regulation.  However, Prude's description of the claims he and Nistler would pursue do not suggest that he had a non-frivolous claim.  Prude claims he wanted to pursue First Amendment and RLUIPA claims related to his belief in the "Growth and Development" blueprint of the Gangster Disciples.  Prude does not flesh out the details of these potential claims; critically, he has not even articulated how the Growth and Development belief system is religious in nature, or exactly how DOC officials have prevented him from practicing his Growth and Development beliefs.  As such, Prude has not shown that he would even be able to articulate a claim in federal court.

Most importantly, Prude has not shown that Meli's review of his communications with Nistler hampered Prude's ability to pursue these claims.  Indeed, the "right of access to the federal courts is not absolute; rather, an individual is only entitled to meaningful access to the courts."  *In re Chapman*, 328 F.3d 903, 905 (7th Cir. 2003).  The fact that Nistler balked at representing Prude after Meli reported him did not create a barrier to Prude pursuing that lawsuit on his own.  Prude has a history of prosecuting civil lawsuits in this court *pro se*, in

which he has represented himself adequately and, in at least one case, successfully. *See Prude v. Ward*, No. 18-cv-79-slc (W.D. Wis.) (proceeding to trial in a six-plaintiff lawsuit related to a strip search); *Prude v. Boughton*, No. 18-cv-361-slc (W.D. Wis.) (proceeding on a failure to protect claim, in which Prude has filed his own summary judgment motion and has responded fully to defendants' motion for summary judgment); *Prude v. Milwaukee County Jail*, No. 13-cv-718-bbc (W.D. Wis.) (claims survived summary judgment and the parties filed a stipulation of dismissal prior to trial).   Prude has not submitted any evidence suggesting that he was in any way prevented from bringing his own lawsuit related to his Growth and Development belief system because Nistler declined to represent him further.   As such, no reasonable trier of fact could conclude that Meli's review of Prude's legal mail hindered his prosecution of a non-frivolous claim.   Accordingly, defendants are entitled to judgment in their favor on the merits of Prude's legal mail interference claim.

### C.  Qualified Immunity

Finally, defendants are entitled to qualified immunity from damages on all of Prude's claims.   "Qualified immunity protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)).   The inquiry is two-fold:  "(1) whether the facts, taken in the light most favorable to the plaintiff[], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

Whether a right was "clearly established" is grounded in the notion of fair notice.  Thus "[a] rule is too general if the lawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'"  *District of Columbia v. Wesby*, -- U.S. --, 138 S. Ct. 577, 199 L. Ed.2d 453 (2018) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034 (1987)).  The Court of Appeals for the Seventh Circuit recently reminded courts that "clearly established law cannot be framed at a 'high level of generality.'"  *Campbell*, 936 F.3d at 545 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074 (2011)).  Rather, "[e]xisting caselaw must dictate the resolution of the parties' dispute," meaning that the "precedent must have placed the . . . constitutional question beyond debate.'"  *Campbell*, 936 F.3d at 545 (citations omitted).  Accordingly, courts must "[f]rame the constitutional right in terms granular enough to provide fair notice."  *Id.*  Defendants argue that no clearly established law would have put Meli on notice that his actions violated Prude's constitutional rights.

Starting with Prude's due process claims related to the withheld Meyeroff letter, as discussed above, that letter was not exculpatory and only pertained to Prude's intended use of the funds.  Prude has not cited to any pre-2016 circuit or Supreme Court authority suggesting that prisoners have a due process right to admit evidence that is not clearly exculpatory.

As to Meli's monitoring Prude's mail, Prude can cite to no Supreme Court or circuit authority holding that mail interference leading to a prisoner's failure to retain counsel amounts to a Fourteenth Amendment denial of access to the courts.  Furthermore, even if Prude had been pursuing a First Amendment claim related to the mail interference generally, such a claim would be governed by *Turner*, 482 U.S. 78, 89-91 (1987), in which the Supreme Court held that prison regulations are justified so long as they are reasonably related to

31

legitimate penological interests. *Id.* at 89-91. It is undisputed that Meli had a reasonable basis to screen Prude's communications with Nistler due to suspicions about whether Prude was violating policy and the law. Therefore, even framing Prude's mail interference claim more generally under the First Amendment, Meli would be entitled to qualified immunity.

Finally, with respect to Meli's involvement in the conduct report hearing process, I previously have concluded that this circuit's and the Supreme Court's guidance related to impermissible bias is not defined clearly. *See Kalafi v. Brown*, No. 16-cv-847, 2018 WL 1660732, at *10 (W.D. Wis. Apr. 5, 2018) ("The contours of what constitutes impermissible bias with respect to a prison are not well-delineated."). Furthermore, in granting Prude leave to proceed on this claim against Meli, I noted that I had not been able to locate any authority addressing this particular situation. (August 9, 2019 Order (dkt. 103) 2.)

Prude has not directed me to any authority suggesting that Meli's level of involvement violated clearly established law. Instead, Prude cites to *Redding v. Fairman*, 717 F.2d 1105 (7th Cir. 1983), in which the Seventh Circuit acknowledged prisoner's right to a "neutral and detached" decisionmaker. *Id.* at 1112. Yet that decision did not define whether an investigating officer, like Meli, was prohibited from having any interactions with hearing officers prior to the conduct report hearing. Given the absence of clear guidance as to when an investigating officer's interactions with a hearing officer oversteps constitutional bounds, Meli is entitled to qualified immunity on this claim as well. Accordingly, defendants are entitled to summary judgment on all of Prude's claims, and I am granting their motions, denying Prude's motions, and entering judgment in defendants' favor.

ORDER

IT IS ORDERED that:

1.  Plaintiff Terrance Prude's motion for judgment on the pleadings and motions for summary judgment (dkt. 56, 57, 107) are DENIED.

2.  Defendants' motions for summary judgment (dkt. 75, 112) are GRANTED.


Entered this 27th day of April, 2020.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge

33